IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| ROBERT PLOUDRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 14-4077-CV-C-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Robert Ploudre seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in improperly evaluating the opinion provided by Dr. Kimetha Fairchild that plaintiff would miss at least two days of work per month, would require extra breaks and rest throughout the day, would have problems using his hands for one-third of the day due to neck-related neuropathy, and would need to lie down during the day due to pain and fatigue. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

I.  **BACKGROUND**

On July 20, 2011, plaintiff applied for disability benefits alleging that he had been disabled since October 1, 1993, later amended to July 18, 2011 (Tr. at 187). Plaintiff's disability stems from diabetes, coronary heart disease, acid reflux, sleep apnea, erectile dysfunction, and poor bladder control (Tr. at 208). Plaintiff's application was denied on September 20, 2011. On January 9, 2013, a hearing was held before an Administrative Law Judge. On February 20, 2013, the ALJ found that plaintiff was not under a "disability" as

defined in the Act. On January 29, 2014, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

3

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Gary Weimholt, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1976 through 2012:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1976 | $ 722.93 | 1995 | $ 51,118.52 |
| 1977 | 5,206.64 | 1996 | 53,113.14 |
| 1978 | 7,220.90 | 1997 | 28,236.52 |
| 1979 | 13,715.76 | 1998 | 31,549.58 |
| 1980 | 576.84 | 1999 | 51,426.57 |
| 1981 | 27.50 | 2000 | 51,544.48 |
| 1982 | 7,083.66 | 2001 | 61,497.61 |
| 1983 | 0.00 | 2002 | 45,614.56 |
| 1984 | 1,562.85 | 2003 | 0.00 |
| 1985 | 21,000.00 | 2004 | 38,865.55 |
| 1986 | 25,574.34 | 2005 | 10,619.74 |
| 1987 | 14,970.84 | 2006 | 44,815.97 |
| 1988 | 33,064.68 | 2007 | 40,370.72 |
| 1989 | 36,041.69 | 2008 | 16,893.12 |

4

| | | | |
|---|---|---|---|
| 1990 | 38,129.36 | 2009 | 2,242.83 |
| 1991 | 43,336.89 | 2010 | 0.00 |
| 1992 | 55,500.00 | 2011 | 0.00 |
| 1993 | 46,695.84 | 2012 | 0.00 |
| 1994 | 49,128.73 | | |

(Tr. at 163-164).

### Disability Report

Plaintiff worked as a financial auditor from 2004 through 2005 earning $65,000 per year (Tr. at 209). He worked as a field service representative in the commercial finance industry from 2006 through 2008 earning $16.00 per hour. He worked as a warranty auditor for a car dealership from 1999 through 2002 earning $63,000 per year.

### Work History Report

When plaintiff worked as a field service representative, he never had to climb; stoop; kneel; crouch; crawl; or handle, grab or grasp big objects (Tr. at 230). The only lifting or carrying he did was his small handheld inventory computer device which weighed less than 10 pounds (Tr. at 230). He walked anywhere from 15 minutes to 2 hours with frequent breaks (Tr. at 231). He sat anywhere from 15 minutes to 4 hours with frequent breaks (Tr. at 231). He handled his small handheld inventory computer device from 1 to 6 hours per day with frequent breaks (Tr. at 231).

When plaintiff worked as a Dealer Rep/Auditor, he never had to stoop; kneel; crouch; crawl; or handle, grab or grasp big objects (Tr. at 232). His lifting consisted of moving one file from the left side of his desk to the right side of his desk when he completed a loan audit review (Tr. at 232). The file weighed less than 10 pounds (Tr. at 232). Plaintiff walked from 1 to 5 minutes at a time, he would stand from 1 to 3 minutes at a time, and he would sit from 1

Case 2:14-cv-04077-REL   Document 19   Filed 03/23/15   Page 5 of 46

to 2 hours at a time (Tr. at 233). He would write, type, and handle loan file paperwork for 8 hours per day (Tr. at 233).

When plaintiff worked as a warranty auditory/trainer and consultant, he never had to climb; stoop; kneel; crouch; crawl; or handle, grab or grasp big objects (Tr. at 234). His lifting consisted of moving dealer files by hand from the left side of his desk to the right side of his desk, and the files weighed less than 10 pounds (Tr. at 234). He supervised 4 people (Tr. at 234). He walked from 1 to 5 minutes at a time, he stood from 1 to 5 minutes at a time, and he sat from 1 to hours at a time (Tr. at 235). He would write, type, and work on paperwork throughout the 8-hour day (Tr. at 235).

**Function Report**

In a Function Report dated August 10, 2011, plaintiff described a typical day as taking medication, eating, checking his blood sugar and blood pressure, reading, watching television, reading email and surfing the internet using a computer, and taking several short naps during the day (Tr. at 244-250). Plaintiff mostly described what medications he takes at what times during the day. There is no detail provided as to what activities he performs during the day.

Plaintiff does not take care of any other person or any pets. His sleep is disrupted due to sleep apnea and nocturia. He has trouble dressing because his hands, wrists, arms and feet hurt due to diabetes. He sometimes has trouble putting on underwear and socks. He gets lightheaded and dizzy when he takes a shower. Plaintiff's wife reminds him to take his medication and check his blood pressure and blood sugar (Tr. at 246).

Plaintiff prepares his own breakfast (Tr. at 246). It takes him 15 to 20 minutes (Tr. at 246). Plaintiff has dropped plates, pans and cups due to nerve pain from diabetes. Plaintiff is limited to performing light cleaning inside the house. He cannot do yard work because his medications make him dizzy and sensitive to the sun (Tr. at 245-246). Plaintiff is able to go

out alone and he can drive (Tr. at 247). He shops in stores weekly. He is able to pay bills, handle bank accounts, make change and use a checkbook. He has no problems getting along with family, friends, neighbors or others (Tr. at 248). His conditions affect every ability listed on this form except hearing and getting along with others (Tr. at 248). His conditions affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions and use his hands (Tr. at 248). Plaintiff is left handed. He can walk 50 to 100 feet before needing to rest for 10 to 15 minutes. "It depends on the situation that I encounter and how I feel that day." He has trouble following directions due to his "illness, conditions and medications."

Plaintiff reads and watches television every day and he does those things fairly well (Tr. at 252). He gets on the computer every other day and does that fairly well (Tr. at 252).

**Missouri Supplemental Questionnaire**

Plaintiff was receiving Medicaid benefits (Tr. at 257). He reported trouble emptying his bladder (Tr. at 259). He has had sleep problems since 1993 and was diagnosed with sleep apnea in 2005 (Tr. at 259).

**B.     SUMMARY OF MEDICAL RECORDS**

The bulk of plaintiff's medical records predate his alleged onset date.

Plaintiff was a patient at Boone Hospital from April 30, 2007, until his discharge on May 3, 2007 (Tr. at 418-424). He was brought to the hospital due to vomiting and diarrhea and was admitted with a diagnosis of gastroenteritis (stomach flu). "He is employed. He is not particularly happy with his job right now." (Tr. at 421). Plaintiff was hydrated and was given insulin while in the hospital since his Metformin had been stopped due to vomiting. Plaintiff was told to remain off work until May 10, 2007.

On May 17, 2007, plaintiff saw Ellen McQuie, M.D., at Columbia Family Medical Group for a follow up on diabetes (Tr. at 357-358). "Hospitalized with gastroenteritis. Is starting to improve. Still fatigued but better." His blood pressure was 128/72 and he weighed 250 pounds. He had good range of motion in his neck. He was cleared to return to work the next week. "Encouraged diet and exercise."

On May 21, 2007, plaintiff had a stress echocardiogram performed by John Best, M.D., a cardiologist at Columbia Regional Hospital (Tr. at 368). The stress test was normal; however, he had a hypertensive response to exercise.

On May 29, 2007, plaintiff saw Ellen McQuie, M.D., at Columbia Family Medical Group complaining of fatigue (Tr. at 355-356). "The problem is improving. Symptom is aggravated by work issues." Plaintiff had an upper respiratory infection. He was on a week of vacation and then was planning to change jobs in mid July. Plaintiff reported that his blood sugar was generally below 120. It was high in the office that day because he had cake the day before. "Trying to walk regularly which is his usual exercise." His blood pressure was 128/68 and he weighed 250 pounds. His diabetes was assessed as controlled. He was told to continue his diabetic diet and exercise.

On June 2, 2007, plaintiff saw Slamac Vahabzadeh, M.D., at Columbia Family Medical Group for a sinus infection (Tr. at 352-354). His blood pressure was 130/88 and he weighed 251.2 pounds.

On August 3, 2007, plaintiff saw Ellen McQuie, M.D., at Columbia Family Medical Group, for a sinus infection (Tr. at 369). "He is under some stress with his job and trying to find something different." Dr. McQuie prescribed an antibiotic and suggested allergy testing if he continued to have problems with sinus infections.

On September 6, 2007, plaintiff saw Jeffery Belden, M.D., at Columbia Family Medical Group with complaints of musculoskeletal pain (Tr. at 350-351). He complained of his hips, thighs, knees and lower legs hurting after doing yard work. Extra Strength Tylenol relieved his pain. Plaintiff's blood sugar was 176 (normal is 100 or below). "The patient admitted he ate cookies and candy last night." Plaintiff's knee pain had been caused by kneeling on concrete at work doing inventory. Plaintiff said another doctor had told him he did not have arthritis and that his hip pain was related to his diabetes. Dr. Belden doubted that was the case. Plaintiff's blood pressure was 130/70 and he weighed 253.6 pounds. Plaintiff was prescribed Naproxin (non-steroidal anti-inflammatory) for his knee pain.

On September 7, 2007, plaintiff saw Ellen McQuie, M.D., at Columbia Family Medical Group for a sinus infection (Tr. at 348-349). His blood sugar was "fairly well controlled." His blood pressure was 148/68 and he weighed 253 pounds.

On September 21, 2007, plaintiff had a CT scan of his sinuses which showed mild maxillary sinusitis and right mucous retention cyst (Tr. at 416). Otherwise the CT scan was normal.

On December 10, 2007, plaintiff saw Kathleen David, M.D., at Columbia Family Medical Group for a follow up on diabetes (Tr. at 344-347). His diabetes was stable. He had no associated symptoms. "Pt has a job that requires a lot of walking but he does no other exercise outside of work. Has not been watching diet as carefully of late." His blood pressure was 128/72 and he weighed 256 pounds. He had "no unusual anxiety or evidence of depression." Urine testing was normal (Tr. at 377). He said his average blood sugar at home had been 150. His diabetes medication was increased. He was given a new prescription for CPAP for obstructive sleep apnea. He had lab work done which included a hemoglobin A1C of 7.7 indicating an average blood sugar level of approximately 165 over the past three months

9

(Tr. at 376). Plaintiff was informed of the results the following day and his medication was increased.

On February 18, 2008, plaintiff saw Kathleen David, M.D., at Columbia Family Medical Group for a follow up on diabetes and hypertension and complaints of right shoulder pain (Tr. at 341-343). Fasting blood sugar was 140 in the office. "Pt was just laid off from his job and has been eating more and working out less." Plaintiff indicated he preferred to try lifestyle changes for his elevated hypertension instead of increasing his medications. "Has had right shoulder pain for several months s/p [status post] injury. Hurts with overhead motions. Denies neck pain or n/t [numbness/tingling] in hand. No radiation of pain down arm." Plaintiff's blood pressure was 132/80 and he weighed 257 pounds. He had pain with abduction beginning at 90 degrees but could make a full overhead arc. He had mild tenderness with external and internal rotation. His "extremities appear normal." He had "no unusual anxiety or evidence of depression." Plaintiff was told to decrease his salt intake, exercise, eat a low fat diet, and lose weight. For his shoulder he was told to perform shoulder exercises and range of motion exercises, use ice as needed and use non-steroidal anti-inflammatories as needed.





On May 2, 2008, plaintiff saw Kathleen David, M.D., at Columbia Family Medical Group for symptoms of upper respiratory infection and bilateral hip, thigh and lower back pain after working in his yard (Tr. at 338-340). His blood pressure was 140/72 and he weighed 266.6 pounds. Plaintiff's exam was normal. He had no tenderness in his back,

10

negative straight leg raising, and normal extremities.  He had "no unusual anxiety or evidence of depression."  Plaintiff was told to use ice and heat on his back, use a non-steroidal anti-inflammatory as needed, and he was given some Flexeril (muscle relaxer) to use briefly as needed.  His hydrochlorothiazide (diuretic) was increased for hypertension.  "Pt. advised to start exercising and to lose weight."

On May 19, 2008, plaintiff saw Kathleen David, M.D., at Columbia Family Medical Group for a follow up on diabetes (Tr. at 335-337, 373-374).  His blood sugar over the past month had averaged 103.  His blood pressure was 124/76 and he weighed 265 pounds.  His exam was normal including "no unusual anxiety or evidence of depression."  Urine testing was normal.  His hypertension was under good control, his diabetes was well controlled.  "Advised weight loss and exercise." Plaintiff had lab work including a Hemoglobin A1c which was high at 7.5 indicating an average blood sugar level of approximately 165 over the past three months.  Plaintiff was called the following day with those results.  On the same day he had a cardiac stress test which was normal (Tr. at 488-493).

On May 31, 2008, plaintiff saw Carolle Silney, M.D., at Columbia Family Medical Group for allergy symptoms (Tr. at 332-334).  His blood pressure was 122/70 and he weighed 266 pounds.

On July 25, 2008, plaintiff saw Kathleen David, M.D., at Columbia Family Medical Group for a sinus infection and a follow up on hyperlipidemia (Tr. at 329-331).  Plaintiff's blood pressure was 124/82 and he weighed 263 pounds.  Plaintiff was continued on his same medications for benign hypertension and diabetes.

On September 8, 2008, plaintiff saw Kathleen David, M.D., at Columbia Family Medical Group for a sinus infection and urinary problems (Tr. at 326-328).  "Patient reports that he has had urinary frequency for about one month."  Plaintiff's average blood sugar

11

reading at home had been 115. His blood pressure was 118/72 and he weighed 262 pounds. He was assessed with benign hypertension and his hydrochlorothiazide was refilled. He was assessed with type 2 diabetes, "controlled." He had no sinus infection but a CT of his sinuses was ordered. His urinalysis was normal.

On September 9, 2008, plaintiff had a CT of his sinuses (Tr. at 388, 414). Andrew Getzoff, M.D., found no acute change compared to his last CT in September 2007. He had a mucous retention cyst in the right maxillary sinus.

On September 16, 2008, plaintiff saw Kathleen David, M.D., at Columbia Family Medical Group to discuss the results of the CT scan of his sinuses (Tr. at 323-325). It was unchanged from one year earlier. "Pt reports that for his entire life he has always urinated frequently. It has been a little worse lately." Plaintiff's blood pressure was 128/70 and he weighed 263.6 pounds. Aside from swollen sinuses, his exam was normal including "no unusual anxiety or evidence of depression." Plaintiff's urinalysis from the week before was normal. He was prescribed Detrol for urinary frequency.

On October 17, 2008, plaintiff saw Kathleen David, M.D., at Columbia Family Medical Group for cold symptoms and a follow up on complaints of urinary frequency (Tr. at 320-322). "Pt states that Detrol has helped with his symptoms a little but still urinates every 1-2 hours." Plaintiff complained of fatigue. His blood pressure was 122/80 and he weighed 265 pounds. His exam was normal including "no unusual anxiety or evidence of depression." He was assessed with urinary frequency. Dr. David refilled his Detrol and referred him to urology.

On October 23, 2008, plaintiff saw John McMurtry, M.D., at Urology Associates (Tr. at 290-292). Plaintiff complained of bladder control issues for the past few months worsened due to diabetes. He complained of decreased energy level and libido. He weighed 267.6

12

pounds and his blood pressure was 139/72 (Tr. at 286). "His post void residual is only 7 cc.[1] Of note, the patient only voided 60 cc, but had only a 3 cc per second flow rate consistent with an obstructive voiding pattern." Dr. McMurtry prescribed Uroxatral.[2]

On November 25, 2008, plaintiff saw John McMurtry, M.D., at Urology Associates for a six-month follow up (Tr. at 289). He had been using AndroGel (testosterone) for 30 days and reported an increase in his libido and energy level. His voiding pattern was "70% better overall managed with Uroxatral 10 mg p.o. [by mouth] daily." Plaintiff was "mostly satisfied with his urinary tract at present." Plaintiff's medications were refilled and he was told to return in six months.

On December 3, 2008, plaintiff saw Kathleen David, M.D., at Columbia Family Medical Group to have a skin tag removed (Tr. at 317-319, 371-372). He also asked for a refill of Naproxen because he had recently begun taking it for bilateral hip pain. Plaintiff's blood pressure was 124/80 and he weighed 266 pounds. His physical exam was normal including "no unusual anxiety or evidence of depression." Plaintiff's blood sugar was high at 163 and his hemoglobin A1c was 7.7, indicating his average blood sugar over the past three months was about 170. Plaintiff reported that he had not been exercising. "Encouraged lifestyle modifications." For his hip pain, plaintiff was encouraged to use Tylenol and to start exercising.

---

[1]Post void residual is the amount of urine remaining in the bladder after urination. Less than 50 is normal.

[2]Uroxatral (alfuzosin) belongs to a group of drugs called alpha-adrenergic blockers. Uroxatral relaxes the muscles in the prostate and bladder neck, making it easier to urinate. Uroxatral is used to improve urination in men with BPH, or benign prostatic hyperplasia (enlarged prostate).

13

On December 18, 2008, plaintiff saw George Prica, M.D., at Columbia Family Medical Group for cold symptoms (Tr. at 314-316). Plaintiff's blood pressure was 120/72. He weighed 267 pounds. He was assessed with sinus infection.

On February 17, 2009, plaintiff saw George Prica, M.D., at Columbia Family Medical Group for symptoms of sinus infection (Tr. at 311-313). Plaintiff's blood pressure was 120/80. He weighed 266 pounds. His physical exam was normal other than sinus symptoms. He was assessed with sinus infection.

On May 6, 2009, plaintiff saw Madonna Ferris, a nurse practitioner, at Urology Associates for a six-month follow up (Tr. at 288). He weighed 267 pounds and his blood pressure was 111/66 (Tr. at 286). Plaintiff continued to use Uroxatral and AndroGel but was still getting up once a night to urinate. "He stated that he has lost his job and he is going to be without insurance relatively soon, so he is very much interested in any way we can help him out with what is happening. He also is having erectile dysfunction." Plaintiff's blood sugar was 100 which is normal. His post void residual, which measures the amount of urine left in the bladder after urination, was zero. Plaintiff was given samples of Uroxatral along with a year's prescription. His AndroGel was refilled. He was told to return in six months.

On June 29, 2009, plaintiff saw Kathleen David, M.D., at Columbia Family Medical Group for a follow up on diabetes (Tr. at 303-306). Plaintiff reported increased fatigue and weight gain. He denied blurred vision, frequent urination, chest pain, shortness of breath, hypoglycemic episodes and heartburn. His average home blood sugar reading was 108. "He is under a lot of stress as he has been unemployed for a year now. He is not exercising regularly and he admits to 'stress eating'." Plaintiff's blood pressure was 124/82. His physical exam was normal including normal extremities and "no unusual anxiety or evidence of depression." He was assessed with benign hypertension, type 2 diabetes, and obesity. He was encouraged to

14

eat a healthy diet and engage in regular exercise. Plaintiff had lab work done (Tr. at 307-310). His blood sugar was high at 159. His hemoglobin A1c was high at 8.3 (should be 4.3 to 6.1) indicating his average blood sugar level in the past three months was approximately 190. Plaintiff's HDL (good cholesterol) was low at 39 (should be greater than 40).

On August 3, 2009, plaintiff saw Kathleen David, M.D., for a follow up on diabetes (Tr. at 300-302). The notes indicate that plaintiff had been managed with diet and oral medications. Plaintiff denied blurred vision, foot ulcers, increased fatigue, chest pain, shortness of breath, slow healing wounds or sores, diarrhea, burning of extremities, hypoglycemic episodes and heartburn. His average home blood sugar readings were 115. Plaintiff also complained of difficulty getting to sleep and staying asleep, and he reported intermittent back pain with no radiation. He denied bladder incontinence and numbness/tingling in the legs. His blood pressure was 124/80. He was 6'2" tall and weighed 267 pounds. Plaintiff's exam was normal except symptoms of a sinus cold. "Extremities appear normal." He had "no unusual anxiety or evidence of depression." For his back pain, plaintiff was advised to rest, use ice and heat, use a non-steroidal anti-inflammatory in the evening, and perform low back exercises. Ambien was prescribed for insomnia.

On August 3, 2009, plaintiff saw Madonna Ferris, a nurse practitioner, at Urology Associates for a follow up (Tr. at 287). Plaintiff reported that Uroxatral seemed to be helping his condition although he was not seeing much of a change in his overactive bladder. "He does get up one or two times a night. He says his frequency and urgency is directly contributing to his intake and the fact that he has diabetes in addition. He requested me to sign off on his disabled placard and since he is getting less of insurance, I went ahead and signed off of [sic] it given his history." Plaintiff showed Ms. Ferris his scar from bypass surgery and said he has difficulty walking "so I signed that." His urinalysis was "totally negative." Ms. Ferris gave

15

plaintiff four weeks' worth of Uroxatral samples and a prescription for 90 days with 3 refills. She gave him samples of Cialis for erectile dysfunction. "He is to follow up in 11/2009 with Dr. John McMurtry with a uroflow, PVR, PSA, DRE, and office visit. Hopefully at that time he will have a job and have insurance."

On August 12, 2009, plaintiff's blood work showed that his blood sugar was high at 188 (should be below 100) (Tr. at 298-299). Everything else was normal.

On October 9, 2009, plaintiff saw Christopher Hartigan, a nurse practitioner at Family Health Center of Boone County, to establish care (Tr. at 457-460). Plaintiff denied gait disturbance. He denied psychiatric symptoms. He denied bone/joint symptoms and weakness. Plaintiff weighed 263.2 pounds and his blood pressure was 110/76. His physical exam was normal, including his back. He had normal range of motion. "No unusual anxiety or evidence of depression." Plaintiff's coronary disease was note to be mild and improved with "no associated symptoms." His hypertension was stable with "no associated symptoms." His diabetes was noted to be stable with "no associated symptoms." His average home blood sugar reading was 100. Plaintiff was switched to less expensive medications.

Plaintiff had no medical care for almost the next six months.

On March 26, 2010, plaintiff saw Diane Spalding, a nurse practitioner, for a follow up (Tr. at 452-456). Plaintiff reported excessive thirst, frequent urination and burning of extremities. His blood sugars had been up and down and measured 140 on this day. Plaintiff's blood pressure was up. "States he almost got hit by another car. Has not taken medication today." Plaintiff denied polyuria (the excessive passage of urine, i.e., at least 2.5 liters per day for an adult, resulting in profuse urination and urinary frequency, i.e., the need to urinate frequently) (Tr. at 454). He weighed 272.2 pounds and his blood pressure was 149/91. His

physical exam was normal. He was given a prescription for Ambien for insomnia. His Simvastatin was changed to Lipitor.

Plaintiff had no medical treatment for almost the next six months.

On September 15, 2010, plaintiff saw Diane Spalding, a nurse practitioner, for medical refills and labs (Tr. at 446-451). Plaintiff reported that Ambien was working well for his insomnia. In a review of systems plaintiff denied fatigue, shortness of breath, and chest pain. He denied dysuria (painful urination), hematuria (blood in his urine) and polyuria (the excessive passage of urine including frequency) (Tr. at 449). He denied cold intolerance and heat intolerance. He denied gait disturbance. He denied psychiatric symptoms. He denied back pain, bone/joint symptoms, muscle weakness and numbness in his extremities. He weighed 267.4 pounds. His blood pressure was 129/82. Plaintiff's physical exam was normal, including normal range of motion, except he had edema in his lower legs. "No unusual anxiety or evidence of depression."

On November 22, 2010, plaintiff saw Diane Spalding, a nurse practitioner, for a follow up on diabetes, hypertension and hyperlipidemia (Tr. at 422-445). He weighed 270.6 pounds. His blood pressure was 109/71. Plaintiff's Actos was discontinued and he was told to start Victoza, a non-insulin injection used to treat diabetes. Plaintiff was continued on his same medications for hypertension and hyperlipidemia.

Plaintiff had no medical treatment for the next six months.

On May 17, 2011, plaintiff saw Denise Barba, M.D., complaining of diabetes, rectal bleeding, and insomnia (Tr. at 437-441). Plaintiff weighed 261.4 pounds. His blood pressure was 105/71. Victoza was helping reduce his blood sugar but was causing dizziness. His average blood sugar over the past 2 months was 130, over the last 7 months was 111. He

17

agreed to switch to Metformin. Plaintiff requested refills of medication for erectile dysfunction and insomnia, and those medications were refilled.

On May 27, 2011, plaintiff saw Denise Barba, M.D., for diabetes, hyperlipidemia and rib pain (Tr. at 432-436). Plaintiff weighed 262 pounds. His blood pressure was 116/75. Plaintiff's cholesterol levels were noted to be good. "Fell last winter, landed on R side of the body; still feels some pain in R rib cage and R side of neck; bruised in the winter but now resolved." His diabetes was noted to be uncontrolled; however, he was continued on the same medications and told to watch his diet closely.

On June 29, 2011, plaintiff saw Matthew Struttmann, M.D., for an evaluation of gastroesophageal reflux disease (Tr. at 399-401). Plaintiff reported a five-year history of heartburn, relieved with Aciphex, but when he forgets to take it he experiences the heartburn. Overeating causes breakthrough heartburn which is relieved with over-the-counter Tums. He occasionally has difficulty swallowing pills and bread. Plaintiff had lost some weight with new diabetes medication and was down to 260 pounds. His blood pressure was 117/71. Plaintiff had normal gait and his physical exam was normal. "He has normal flow of thought and does not seem depressed. Alert and oriented x3." Plaintiff's blood sugar was 112. Dr. Struttmann recommended plaintiff have an upper GI endoscopy. "I do think that slow, steady weight loss would help significantly, and we went over measures for that, I spent a great deal of time on that."

July 18, 2011, is plaintiff's alleged onset date.

On July 18, 2011, plaintiff had an upper GI endoscopy due to complaints of heartburn and dysphagia (difficulty swallowing) (Tr. at 392-412). He had a colonoscopy that same day. In recovery plaintiff had some chest pain and was transferred to Boone County Hospital. Plaintiff indicated he had undergone a cardiac catheterization in 1993 which revealed single-

Case 2:14-cv-04077-REL   Document 19   Filed 03/23/15   Page 18 of 46

vessel disease. He had a carotid artery bypass graft at that time. He continued to be followed by a cardiologist, and his last cardiac stress test was two years earlier and was normal. Plaintiff reported that he was unemployed and had been laid off from his last job as an auditor. His blood pressure was 130/66. He underwent a cardiac catheterization which revealed significant blockage but the doctor indicated it was to be medically managed. He had enlargement of the left ventricle. Ejection fraction was 55%.[3] "The patient was asked to follow a diabetic low-cholesterol diet. The patient was asked to restrict his sodium to a 2 g a day diet. . . . Advised of no lifting over 5 pounds for 7 days."

On July 20, 2011, plaintiff applied for disability benefits.

On July 22, 2011, plaintiff saw Denise Barba, M.D., for coronary artery disease and status post catheterization (Tr. at 427-431). Plaintiff weighed 259.4 pounds. His blood pressure was 113/73. Plaintiff was given a refill of nitroglycerin and a referral to see Dr. John Boyer. "No heavy lifting for now."

On August 1, 2011, plaintiff saw Denise Barba, M.D., complaining of a headache and sinus/allergy symptoms (Tr. at 464-469). Plaintiff weighed 260.6 pounds and his blood pressure was 117/70. Plaintiff was told to take Zyrtec at night due to drowsiness.

On October 13, 2011, plaintiff saw John Boyer, M.D., for a follow up on coronary artery disease (Tr. at 494-497). "Since his discharge [from the hospital on July 18, 2011], he has been actually feeling well. He exercises by walking every other day. He has had no

---

[3]"During each heartbeat cycle, the heart contracts and relaxes. When your heart contracts, it ejects blood from the two pumping chambers (ventricles). When your heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it doesn't empty all of the blood out of a ventricle. The term 'ejection fraction' refers to the percentage of blood that's pumped out of a filled ventricle with each heartbeat. The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal."
http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286

symptoms of angina. Breathing has been stable." Plaintiff noted some non-specific residual headaches "that he relates to bumping his head in an airplane." He denied any history of depression. Plaintiff weighed 256.2 pounds. His blood pressure was 118/70. Plaintiff had no spinal abnormalities. He had normal muscle strength and tone. Plaintiff wanted to simplify his medical regimen. Because his triglycerides had been normal, Dr. Boyer stopped the TriCor but continued the other medical therapy.

On November 18, 2011, plaintiff saw Diane Spalding, a nurse practitioner at Family Health Center of Boone County, for a follow up on diabetes (Tr. at 511-515). His sedentary lifestyle was noted to be a risk factor for diabetes. Plaintiff denied burning of extremities and frequent urination (Tr. at 511, 513). He denied chest pain and fatigue. He weighed 254.6 pounds and his blood pressure was 121/75. His physical and psychiatric exams were normal. Plaintiff was told to continue on his same medications and lab work was ordered.

On December 8, 2011, plaintiff saw Diane Spalding, a nurse practitioner, at Family Health Center of Boone County, for a follow up on diabetes (Tr. at 505-509). Plaintiff's last A1c was 7.8% (indicating an average blood sugar reading of approximately 170 over the past three months), "so I asked him to come in to start insulin." Plaintiff's sedentary lifestyle was listed as a risk factor. Plaintiff denied depressed mood; he denied diminished interest or pleasure. He weighed 258.2 pounds and his blood pressure was 116/77. No physical exam was performed (Tr. at 508). Plaintiff was prescribed Victoza for his diabetes.

On January 27, 2012, plaintiff saw Kimetha Fairchild, M.D., at Family Health Center of Boone County (Tr. at 499-504). Plaintiff's sedentary lifestyle was listed as a risk factory related to his diabetes. His blood sugar readings had been averaging in the 140s. Plaintiff reported that his cardiac symptoms were controlled. He last used nitroglycerin in July. Plaintiff denied chest pain, headache and visual disturbances. "Taking meds as [prescribed], no complaints."

Plaintiff reported "occasional dizziness on standing, is aware so stands still on standing in preparation." Plaintiff's hypertension and hyperlipidemia were noted to be "controlled." Plaintiff denied fatigue, shortness of breath, chest pain, anxiety, depression, insomnia, and headache. He weighed 255.6 pounds and his blood pressure was 114/76. Plaintiff's physical and mental exam was thorough and entirely normal. "Pt wants to stop Victoza due to side effects. Will d/c and start Januvia 50 mg daily. Continue Amiryl 8 mg daily and Metformin 2000 mg daily. Discussed improved dietary choices." Plaintiff's medications for hypertension, hyperlipidemia and carotid artery disease were all continued.

On March 23, 2012, plaintiff was seen at the Urology Clinic at University of Missouri Health System (Tr. at 517-522). His chief complaint was, "hypogonadism, lower urinary tract symptoms and here to establish care, erectile dysfunction." "Mr. Ploudre has a significant history of . . . incomplete emptying, poor stream, intermittent stream and increased frequency. He also gives a history of nocturia [urination during the night] 3-4 times at night. He does have a history of urgency and no history of any incontinence. No history of any lower urinary tract symptoms. He was previously on Uroxatral, but however, this is not covered by insurance and therefore he is not on the same. He has also used Detrol in the past." Plaintiff denied a past history of emotional disorder and frequent headaches. He reported currently experiencing weight loss, loss of vision, sinus drainage, constipation, joint/muscle pain, skin changes/rash/dryness, numbness/tingling in his extremities, bruising, allergies, and hot/cold intolerance. He checked both "yes" and "no" for mood swings. On exam plaintiff's head and neck were normal. He had a moderately enlarged benign-feeling prostate. Urinalysis revealed microscopic hematuria (blood in the urine) "The bladder scan was also performed and a PVR[4]

---

[4]Post void residual, or the amount of urine remaining in the bladder after urination. Less than 50 is normal.

was only 10 mL." Dr. Naveen Pokala informed plaintiff that "part of the reasons for his increased frequency and nocturia could be a combination of his diabetes and the use of his diuretics, including hydrochlorothiazide. Therefore, I have advised him to cut down his fluid intake after 7 o'clock in order to help with his nocturia." Dr. Pokala recommended a CT urogram and cystoscopy to evaluate his microscopic hematuria.

Also on March 23, 2012, plaintiff had x-rays of his lumbosacral spine due to complaints of lower back pain (Tr. at 530-531). The x-rays showed no compression, no subluxation, and moderate narrowing of L1-L2 and L2-L3 interspaces with small spurs. He had minimal narrowing of the lumbosacral joint. Sacroiliac joints were normal.

On April 10, 2012, plaintiff saw Prudence Baugher, a physician's assistant in the Orthopedic Clinic at University of Missouri Health System (Tr. at 534-542). He denied depression (Tr. at 536). He denied memory loss (Tr. at 536). Plaintiff completed a disability index (a check-the-box form) and indicated that pain prevents him from standing for more than a half an hour (Tr. at 537). He indicated that, "it is painful to look after myself and I am slow and careful." He indicated that his sleep is occasionally disturbed by pain and that because of pain he gets less than 6 hours of sleep. He said that he can only lift very light weights. He stated that pain prevents him from walking more than 100 yards and that pain has restricted his social life and he does not go out as often. He reported that pain prevents him from sitting for more than one hour and restricts him to short necessary journeys under 30 minutes. "This episode 'of intermittent back pain' started on January 20, 2012 suddenly. Sitting, walking, lying down to sleep and picking something up makes it worse. Ice packs, warm pack, Naprosyn and Tylenol make it better. He currently rates his pain as a 6-8/10. He feels moving the wrong way out of his living room chair started this episode of pain. . . . He has been doing a home exercise program." Plaintiff reported all of the following symptoms:

22

weight loss, chills, headache, dizziness, numbness, double vision, blurriness, ringing, difficulty swallowing, chest pain, skipped heartbeats, peripheral edema, cough, shortness of breath, diarrhea, rectal bleeding, incontinence, constipation, musculoskeletal pain, weakness, arthritis, joint swelling, bruising, insomnia, fatigue, and nervous exhaustion.



On exam, his blood pressure was 132/78, and he weighed 255 pounds. Plaintiff was "minimally tender to palpation over the lumbar spinous processes." He had limited range of motion with pain at extremes of flexion and extension. His motor strength was normal. X-rays showed moderate spurs at L2-3, L3-4, and L4-5, and facet sclerosis at L4-5 and S1. An MRI was recommended.

On April 12, 2012, plaintiff had an MRI of the lumbar spine which showed mild lumbar spondylosis[5] (Tr. at 545-546).

On April 20, 2012, plaintiff had a CT urogram (evaluates the kidneys, ureters and bladder) and cystoscopy (test that allows the doctor to look inside the bladder) which were normal (Tr. at 532-533).

On May 1, 2012, plaintiff saw Prudence Baugher, a physician's assistant in the Orthopedic Clinic at University of Missouri Health System (Tr. at 543-544). Ms. Baugher reviewed the MRI and assessed lumbar degenerative disk disease and mild lumbar spondylosis. She recommended an epidural steroid injection.

---

[5]Lumbar spondylosis is a general term for age-related wear and tear affecting the spinal disks in the lumbar spine. As the disks dehydrate and shrink, bone spurs and other signs of osteoarthritis develop.
http://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/basics/definition/con-20027408

Later that morning plaintiff saw Kimetha Fairchild, M.D. (Tr. at 640-645). She noted that plaintiff's back problem was stable. "Symptoms are aggravated by lying/rest, cold weather, worse at night and in AM." Plaintiff said he was taken off Celebrex "because of possible liver complications." He was scheduled for a steroid injection. He reported that he was walking around the block twice a day for exercise. His sedentary lifestyle was noted to be a risk factor for diabetes. "States blood sugars have been erratic. Has not been snacking as much, then gets lows and eats quickly - too much - and then has highs in AM." Plaintiff reported that his blurred vision and shakiness resolved after five to ten minutes after eating. Plaintiff's hypertension was noted to be stable. He denied headache. He reported back pain. Plaintiff weighed 253.8 ponds. His blood pressure was 129/80. He had tenderness in his lumbar spine with mildly reduced range of motion. His had good mood and affect. Dr. Fairchild prescribed Celebrex even though plaintiff had reported being taken off that medication by another doctor due to possible liver complications. Plaintiff was told to adhere to a diabetic diet.

On May 7, 2012, plaintiff had an epidural steroid injection (Tr. at 548-556, 595-596). "Patient stated his pain was improved immediately post procedure."

On May 19, 2012, plaintiff saw John Best, M.D., for a cardiac stress test which was normal (Tr. at 557-558). "He did have a hypertensive response to exercise" but no exercise-induced arrhythmias.

On May 23, 2012, plaintiff saw Dr. Pokala for the results of his CT urogram and cystoscopy, which were normal (Tr. at 524-529, 571-574). Plaintiff denied mood swings, chest pain, and shortness of breath. "He was originally switched from Uroxatral to Flomas. States he is having improvement. States he does still have nocturia one to three times per night

and occasional intermittency, but overall things are improved." Urinalysis showed no blood, no evidence of urinary tract infection.

On July 26, 2012, plaintiff saw Prudence Baugher, a physician's assistant in the Orthopedic Clinic at University of Missouri Health System (Tr. at 580-582). Plaintiff complained of intermittent low back pain and intermittent right leg pain with some occasional intermittent numbness down the right leg. His pain was worse in the morning and at night, and usually improved throughout the day. Some days are worse than others. His pain was rated a 5/10. "He is able to do most of his activities and has found that with some activity modification, he typically is able to tolerate the pain." Plaintiff reported good relief for one week after having an epidural steroid injection. Plaintiff was observed to be pleasant, smiling and talkative. His affect was appropriate. On exam plaintiff had good circulation to his extremities. He had good range of motion in his spine with pain at extremes of flexion and extension. He had no tenderness. Motor strength was normal. He was able to walk on his toes and heels, and heel-toe tandem walk without difficulty. The MRI from April 2012 was reviewed. Ms. Baugher referred plaintiff to Dr. Varghese for evaluation and treatment.

On July 31, 2012, plaintiff saw Kimetha Fairchild, M.D., for a follow up (Tr. at 631-639). Plaintiff's sedentary lifestyle was listed as a risk factor for his diabetes. "Patient compliance with exercise is fair. . . . Patient is noncompliant with diet." Plaintiff's diabetes was listed as stable (Tr. at 637). Plaintiff's hypertension was listed as stable. Plaintiff reported headaches but said he thought his headaches were caused by his sinuses and going "in and out of air conditioning." Plaintiff reported numbness in hands and feet "after lying down asleep. Lasts 5-20 minutes, feels off and on through day." Plaintiff noted his neck injury from bumping his head in an airplane in 2001, "gradually went away. Next injury about one year ago when fell on ice, went backwards, hit back of head and felt neck and back pain, more

25

painful on side as fell on handle of shovel.  No imaging last year when fell."  Plaintiff reported

worsening back pain.  He said this back pain, which radiates into his legs, was caused by

slipping on ice.  "Symptoms are aggravated by bending, lying/rest, standing and walking."

Plaintiff had seen an orthopedic doctor, Dr. Kuhns, for this who prescribed Celebrex and told

plaintiff to take Tylenol.  Plaintiff continued to report depression.  "That patient's risk factors

include financial worries, social isolation and unemployment. . . .  Feeling depressed due to

looking for job and 'no one wants to hire someone with DM [diabetes mellitus].'  Has applied

for disability.  Has been out of work for 4 years.  'Has taken a toll on my mental and physical

health.'"  Plaintiff weighed 252.4 pounds.  His blood pressure was 130/86.  On exam his gait

was  normal.  Cervical spine had muscle spasm and tenderness and mild pain with motion.  He

had some tenderness in his lumbar spine with "mildly reduced" range of motion.  Grip

strength, muscle strength, and muscle tone were good in all extremities.  Plaintiff's mood and

affect were normal, he was not anxious.  "Somewhat sad affect when talking of job search,

frustration with being unemployed."  Effexor was prescribed for depression, x-rays of

plaintiff's cervical spine were ordered.

On August 3, 2012, plaintiff had x-rays of his cervical spine which showed mild

multilevel spondylitic changes of the upper and middle cervical spine (Tr. at 593-594).

On August 28, 2012, plaintiff saw Prudence Baugher, a physician's assistant in the

Orthopedic Clinic at University of Missouri Health System (Tr. at 577-579).  Plaintiff reported

intermittent low back pain, intermittent right leg pain, cervical spine pain, and occasional

(about three times a week) bilateral arm pain.  He reported occasional numbness of the right

arm which he notices at night when he lying on his arm.  Plaintiff requested evaluation of his

intermittent neck pain and intermittent bilateral upper extremity pain.  Plaintiff was observed

to be "awake, alert, smiling, talkative, and in no acute distress."  Plaintiff had "fairly good

range of motion of the neck without discomfort. He does have pain at extremes of extension, flexion and rotation to the left and right." Motor strength was normal in his arms.

"[He] has some degenerative disk disease of the lumbar spine, along with lumbar spondylosis. He also has had some mild multilevel spondylitic changes of the upper and middle cervical spine. Discussed with him that we cannot work on his entire spine at the same time. He was here 1 month ago as he felt that his lumbar spine was more painful and it caused him more problems so he was referred to Dr. Varghese after an epidural steroid injection at L4-5 . . . [which] had given him good relief for at least a week. He determined that he would like to exhaust all conservative measures first regarding his back pain. Explained to him that we cannot really work on his back pain and his neck pain [at] the same time. He has to determine which is most painful. We will try to help him with that specific area. He can also bring that up when he talks to Dr. Varghese to see if he has any other ideas. In the meantime, however, he can perform a home exercise program for his neck. He can alternate ice packs and warm packs for comfort. He reports that his back certainly is much more troublesome for him than his neck."

Later that morning, plaintiff saw Kimetha Fairchild, M.D., for a follow up (Tr. at 623-630). He complained of neck pain with radiation to the right upper arm. He denied decreased mobility. Plaintiff reported that he had been seen in the orthopedic clinic that morning and was to be followed by Dr. Varghese for pain management and possible injections. "Requesting parking placard, states unable to walk 50 feet due to back pain, sometimes has to use the cart. Has had placard for 4 years, originally given per pt due to his HD." Plaintiff also reported depressed mood and difficulty sleeping. He denied difficulty concentrating and he denied fatigue. "The patient's risk factors include financial worries, history of depression, social isolation and unemployment." Plaintiff's compliance with exercise was noted to be poor. He

weighed 252.5 pounds and his blood pressure was 115/77. He had some tenderness in his cervical and lumbar spine with mildly reduced range of motion. He was fully oriented with good mood and affect. Dr. Fairchild assessed depression not otherwise specified and prescribed Celexa. She assessed neck pain. "Renewed pt handicap placard as unable to ambulate > 50 feet due to his arthritis. Encouraged to continue walking when is able."

On September 13, 2012, plaintiff saw Ebby George Varghese, M.D., in the Interventional Pain Clinic at University of Missouri Health System after having been referred by Ms. Baugher (Tr. at 583-590). Plaintiff complained of pain, numbness, aching, and pins and needles throughout his body. He indicated that his pain is worsened by standing, sitting, lying down, walking, driving, reaching, leaning forward, leaning backward, twisting, and changes in the weather. "In the past he has been on Celebrex, he uses cold, heat modalities, Lodine [non-steroidal anti-inflammatory]. He has been on Percocet [narcotic], hydrocodone [narcotic]. Apparently he was on pain medication after his back injury and then it took him 4 years to get him off of that." Plaintiff described his pain as a 6 or 7 out of 10, worse with "all activities." Plaintiff weighed 249 pounds. His blood pressure was 126/84. He was fully oriented with appropriate mood and affect. His gait was normal. He was able to toe walk, heel walk, fully squat, he had full lumbar flexion and extension. Strength was normal in all extremities. He had no peripheral edema in any extremity. He had full cervical range of motion. Plaintiff was "tender in virtually 18 of 18 tender points identified for fibromyalgia." Dr. Kuhns reviewed plaintiff's cervical spine x-ray from August 3, 2012, and lumbar spine MRI from April 2012. He found that "his primary issue is fibromyalgia." Dr. Kuhns ordered further testing and if negative, "we will consider starting him on Lyrica, Savella or Cymbalta for fibromyalgia and see if we can focus his pain and consider neck and low back procedures at that point for treating additional pain."

Case 2:14-cv-04077-REL   Document 19   Filed 03/23/15   Page 28 of 46

On September 27, 2012, plaintiff saw Craig Kuhns, M.D., in the orthopedic clinic at University of Missouri Health System (Tr. at 575-576). "It seems like most of his disability seems to be coming from his heart and blood pressure issues. He said he gets lightheaded and cannot walk much. Said he really has not done cardiovascular exercise recently. Said he is losing some weight. He went from 275 to 250. He said he is here because his lawyer told him he needed to see a spine surgeon to get on disability. Patient reports when he tried to work as an auditor, he would get neck and back pain from sitting. He would get very stiff. Said he had to sit in a hot tub day and night because of that. He also said he has been having a hard time finding work." Plaintiff had negative straight leg raising. His lumbar spine films demonstrated normal alignment. He had multilevel degenerative disc disease. Impression: "He really does not have any dermatomal findings or any neurologic findings, although he says some pain radiates down his legs." Plaintiff was told to do cardiovascular exercise, lose weight, and manage his diabetes better. "As to whether or not he would be disabled, I really cannot comment on that. I do not look at his MRI or his x-rays and say that he is disabled. I would say maybe he would have a hard time with a lot of lifting and bending in a job, but certainly optimizing his health would be better overall."

Later that day plaintiff saw Kimetha Fairchild, M.D., for a rash (Tr. at 614-622). Plaintiff stated that Dr. Kuhns was rude to him and released him. "[I]s now followed by Dr. Varghese, pain management, told has fibromyalgia. . . . Dr. Kuhns agreed with what NP [nurse practitioner] said and will write a letter for upcoming disability hearing." Plaintiff presented with a depressed mood but denied anxious or fearful thoughts. "The patient's risk factors include financial worries, history of depression, social isolation and unemployment. . . . Stopped Effexor and taking Celexa now, states is helping with depress[ion]. Still feeling depressed about health and unable to work, requesting note from me stated that unable to

29

work so can get food stamps." Plaintiff's sedentary lifestyle was listed as a risk factor under diabetes. He denied blurred vision. Plaintiff weighed 253.2 pounds. His blood pressure was 117/79. His gait was normal. He had some lumbar spine tenderness. He was fully oriented and noted to have good mood and affect. He was assessed with chronic back pain "followed now by Dr. Varghese, pain management;" depression not otherwise specified, improved; diabetes, controlled; and myofascial pain syndrome. He was told to improve his diet and continue exercising and stretching. He was given a prescription for his rash. "Letter written to patient to continue to get food stamps and not seek employment while being evaluated for disability."

On October 30, 2012, plaintiff saw Kimetha Fairchild, M.D. (Tr. at 606-613). Plaintiff reported worsening conditions related to diabetes. "He is experiencing blurred vision, frequent urination, nocturia and polydipsia." Plaintiff reported that he had been eating sweets lately and that he planned to cut back on them. Plaintiff reported fibromyalgia with pain in his shoulders, wrists, knees, and feet. "The pain is aggravated by movement." It is relieved only by pain medications. "States can't do thing[s] that [he] used to do, can't lay down for long, can't exercise as long but does feel better with exercise." Plaintiff's hypertension was noted to be stable. Plaintiff's back pain was stable. He reported that his back and leg pain was relieved by pain medications and walking. Plaintiff denied anxiety and insomnia (Tr. at 609). He weighed 250.8 pounds. His blood pressure was 141/92. His gait was normal. He had some lumbar spine tenderness. He had 8 fibromyalgia tender points. No edema was present. Plaintiff was fully oriented and had good mood and affect. Dr. Fairchild assessed controlled diabetes, uncontrolled hypertension, improved myofascial pain syndrome, and chronic back pain. He was told to do stretching exercises.

30

On November 5, 2012, plaintiff saw Joel Jeffries, M.D., for evaluation of back and leg pain (Tr. at 561-564). "[T]he patient also complains of ongoing neck pain." Plaintiff reported injuries to his back and hips while playing sports when he was younger and also reported an injury to his neck "in an airline incident in 2001." I presume this was the bumping of his head referred to during his October 13, 2011, visit to Dr. Boyer. Plaintiff said that orthopedic doctors and rheumatologists had advised him to "tolerate his situation and be activity as tolerated. Today he complains of neck pain as well as bilateral upper extremity pain". Plaintiff reported dysesthesias (abnormal sensation) in his hands "and has by report been told that these represented peripheral neuropathy likely secondary to his diabetes." Plaintiff reported difficulty with fine motor control. Plaintiff reported problems with depression, insomnia, memory loss, incontinence, fatigue, numbness, blurred vision, nervous exhaustion and the use of a cane or walker. Plaintiff reported a past medical history to include fibromyalgia, neuropathy and depression, among other things.

On exam plaintiff was noted to be pleasant and cooperative. He weighed 253 pounds. His gait was normal. He was able to perform a single leg stand without substantive difficulty. His active range of motion in his neck was only mildly diminished and he had only mild tenderness without muscle spasm. Motor strength testing of his arms was normal. Active range of motion in his lumbar spine was "globally and substantially diminished." He had mild lumbosacral tenderness without muscle spasm. He had normal motor strength in his legs. X-rays of his neck showed mild degenerative change. He was assessed with mild cervical spondylosis and lumbar spondylosis. Dr. Jeffries recommended that plaintiff continue to be treated for pain by Dr. Ebby Varghese -- he said there was nothing surgically that could be offered. He told plaintiff to continue with activity as tolerated.

On November 21, 2012, plaintiff saw Naveen Pokala, M.D., in the Urology Clinic (Tr. at 565-566). "Denies any lower urinary tract symptoms. He had a complete workup for his microscopic hematuria which revealed a normal CT scan. It did not reveal any abnormalities in the urinary tract on his CT urogram. A cystoscopy was normal and the cytology was also normal. On review today, he is entirely asymptomatic. . . . We rechecked his urinalysis today which did not reveal any blood in the urine".

On December 4, 2012, plaintiff was seen by Celso Velazquez, M.D., at the Rheumatology Clinic at the request of Dr. Jeffries (Tr. at 567-569). Plaintiff reported a ten-year history of spinal pain over his cervical and lumbar spines. "These started after a jarring injury in 2001 when an airplane he was flying in went through turbulence." Plaintiff described the pain as moderate and said he has good days and bad days. The pain is worse with activity and he has about one hour of stiffness in the morning. "He currently takes Celebrex [non-steroidal anti-inflammatory] and Tylenol with some improvement. . . . He has occasional widespread pain that he attributes to fibromyalgia which was recently diagnosed. He says the Savella has helped this significantly. . . . He does have non-restful sleep despite being very [diligent] with his CPAP machine. He does have nocturia. He has fatigue but no sleepiness." Plaintiff reported having lost 28 pounds in the last few months. He reported occasional paresthesias in his hands and feet. Plaintiff was described as pleasant. His blood pressure was 139/89. Plaintiff's physical exam was normal including no edema, a normal gait, good range of motion in his cervical spine. He did have mild decreased flexion in his lumbar spine and tenderness with superficial palpation. His hips had decreased internal and external rotation. All other joints had good range of motion. Dr. Velazquez reviewed plaintiff's lumbosacral radiographs and noted that plaintiff has mild spondylosis and that his sacroiliac joints were normal. Dr. Velazquez told plaintiff to continue exercising, losing

32

weight, and using his CPAP. "I have nothing further to add diagnostically or therapeutically at this time and would continue his current medications."

On December 12, 2012, plaintiff saw Kimetha Fairchild, M.D., with complaints of fibromyalgia (Tr. at 597-605). He reported that his pain was "everywhere." He rated his pain a 6/10. It was caused by no injury and was relieved only by pain medication. "Additional information: Saw Dr. Velazquez, told on right meds, on Savella 100 m BID [twice a day], states feels a lot better. Still has aches and pains but much better overall." Plaintiff's diabetes was noted to be stable despite his sedentary lifestyle. He reported experiencing blurred vision and frequent urination. Plaintiff's blood sugar was high that day because he ate apple pie the day before. Plaintiff's hypertension was noted to be stable. Plaintiff weighed 251 pounds. His gait was normal. He had some tenderness in his lumbar spine. No edema was present in his extremities. His affect was appropriate. He had no anhedonia, no agitation, he was not anxious, and his behavior was appropriate. He had "good mood and affect." Under "assessment/plan," Dr. Fairchild noted that plaintiff's myofascial pain syndrome was controlled on Savella, his diabetes was controlled, his hypertension was uncontrolled. "Plans to improve diet." He was told to check his blood sugar daily and reduce sweets and carbohydrates.

That same day plaintiff had chest x-rays which showed no acute cardiopulmonary findings (Tr. at 591-592).

On January 7, 2013, Kimetha Fairchild, M.D., completed a one-page residual functional capacity form (Tr. at 646). She included the following diagnoses: diabetes mellitus, hypertension, coronary artery disease status post bypass, chronic lower back pain, fibromyalgia, cervical and lumbar spondylosis, sleep apnea, and several other conditions unrelated to plaintiff's ability to work. She indicated that plaintiff would miss two days or

more of work per month due to doctor's appointments and chronic pain and fatigue due to nocturia and inadequate sleep caused by pain. She reported that he would need to take extra breaks to use the bathroom because of frequent urination and chronic neck and back pain "necessitating getting increased rest frequently throughout the day." She reported that plaintiff would have problems using his hands "on a regular basis for 1/3 of the workday" due to neck related neuropathy. She found that plaintiff would need to lie down during the day due to fatigue because he often does not sleep well because of his chronic pain and because of cervical and lumbar spondylosis and fibromyalgia.

C.      SUMMARY OF TESTIMONY

During the January 9, 2013, hearing, plaintiff testified; and Gary Weimholt, a vocational expert, testified at the request of the ALJ.

1.      Plaintiff's testimony.

At the time of the hearing plaintiff was 53 years of age and is currently 55 (Tr. at 35). Plaintiff is 6' 2" tall and weighs 254 pounds (Tr. at 35). At the time of the hearing plaintiff was married and had two children, ages 20 and 27 (Tr. at 35-36). Plaintiff lives in a house with his wife and children (Tr. at 36). His wife does not work (Tr. at 36). The family lives off plaintiff's savings and his daughter's Social Security disability (Tr. at 36). Plaintiff's daughter has Down Syndrome (Tr. at 36).

Plaintiff has a valid driver's license and drives two or three times a week (Tr. at 36). Plaintiff has a Bachelor's degree in management and business (Tr. at 37). Plaintiff last worked on February 5, 2008 (Tr. at 37). He stopped working because the company downsized, closing the division, and all of the employees were let go (Tr. at 37). Plaintiff previously worked as a premium auditor at US Insurance Professionals for about three months, and he worked as a staff recruiter for Sprint for less than a year (Tr. at 63-65). Plaintiff tried to work as a

34

Manager Trainee at Wal-Mart after that but the job did not work out because he was not able to function or concentrate (Tr. at 38). Plaintiff said he would argue with people and "not look at their reason behind it" so he was asked to leave (Tr. at 52). He was only there for two weeks (Tr. at 59). The difficulty was with co-workers and sometimes supervisors (Tr. at 52). When plaintiff was asked to be more specific about his problems with co-workers, he said, "The co-workers made fun of me. They mocked me for my diabetes, mocked me for my conditions. I was always lagging behind walking. Always rushing me to get up with them." (Tr. at 59). When asked how his diabetes was a problem, plaintiff said, "That I was always checking it, and if I ate something, I did have some spikes, and they weren't willing to accommodate me." (Tr. at 60). Plaintiff sometimes had this same problem when he held other jobs as well (Tr. at 52).

Plaintiff is most limited due to diabetes (Tr. at 38). He has neck and back pain, he has heart disease, and he is unable to sleep at night (Tr. at 38). Plaintiff's diabetes causes him to use the bathroom frequently (Tr. at 41). On a bad day he uses the bathroom more than 12 times a day (Tr. at 61). He needs to use the bathroom frequently because he does not always empty his bladder each time (Tr. at 61). Fluctuating blood sugar affects his vision, gives him the shakes and affects his walking (Tr. at 41). Plaintiff was on oral diabetes medication but not insulin (Tr. at 42). He monitors his blood sugar daily and his normal range is 120 to 130 (Tr. at 42). When it is at that level, it does not affect his vision or anything (Tr. at 42). When it is higher or lower he has those symptoms, and that occurs about "two more times depending on the day, the week, what I eat." (Tr. at 42). Plaintiff is on medication for frequent urination but it does not help (Tr. at 43). He needs to use the bathroom 3 to 4 times during a 2-hour period (Tr. at 43).

Plaintiff was in an airline accident in 2001 which caused his neck and lower back pain (Tr. at 43). Plaintiff had one steroid injection which helped for about 10 days (Tr. at 44). The

only other treatment that has been offered is Celebrex (Tr. at 44). Sitting, standing, and lying down aggravate his pain (Tr. at 44). Plaintiff was not taking any pain medications (Tr. at 40). He uses hot and cold packs about every other day and takes over-the-counter Tylenol as needed (Tr. at 44). Although he testified that lying down aggravates his pain, he later testified that "laying [sic] down is much more comfortable." (Tr. at 44). He lies down for two and a half hours a day, either in bed or on the couch, due to his back pain (Tr. at 61). His neck pain varies -- some days he cannot lift up his head, other days it is "good" (Tr. at 45). Nothing aggravates his neck pain; he helps relieve the pain with heat and cold (Tr. at 45). He has difficulty turning his head (Tr. at 46). Plaintiff participated in physical therapy in the past and at the time of the hearing was waiting for a reply back to his most recent request for physical therapy (Tr. at 46).

Plaintiff has problems sleeping (Tr. at 52). He tries to get eight hours of sleep but he has to get up at night to go to the bathroom (Tr. at 52). He is not always able to go right back to sleep (Tr. at 52). He averages six or seven hours (Tr. at 53). He sleeps for two to two and a half hours per day during the day (Tr. at 53). Sleep is a way for him to escape the chronic pain (Tr. at 53).

Plaintiff has fibromyalgia which makes him feel tired and "in a fog" (Tr. at 47). Different pressure points in his body ache (Tr. at 47). He is taking Savella which helps (Tr. at 47). The aching is still present, but it is manageable (Tr. at 47).

Plaintiff's heart condition causes chest pain, rapid heart beat, and elevated blood pressure (Tr. at 40). He has the chest pain every once in a while (Tr. at 40-41). He continues to see a cardiologist who is monitoring his stenosis (Tr. at 41). He had coronary bypass surgery in 1993 (Tr. at 48).

36

Plaintiff is on medication for depression which helps (Tr. at 49-50). He saw a counselor for a short time the year before the hearing (Tr. at 49-50). Plaintiff has problems with his memory sometimes -- when people ask him a question, he will sometimes forget the question (Tr. at 50). He has problems concentrating due to his pain (Tr. at 50). He sometimes has problems making decisions -- he will sometimes ask his wife or second guess himself (Tr. at 51).

Plaintiff's medications cause him to be dizzy, lightheaded, and sometimes nauseated (Tr. at 47). Sometimes he gets a hot flush, he is tired, and he gets hives (Tr. at 47).

Plaintiff can sit for 15 to 20 minutes at a time (Tr. at 53). He can walk a half a block (Tr. at 54). He can stand for 10 to 15 minutes at a time (Tr. at 54). He can lift "under 10 pounds" (Tr. at 54). He has difficulty reaching overhead with both arms, he has trouble kneeling, crawling, crouching and stooping (Tr. at 54). Kneeling and crawling are difficult because of dizziness and lightheadedness (Tr. at 54). Crouching and stooping are difficult because of his lower back pain (Tr. at 55). His diabetic neuropathy and fibromyalgia cause his hands to go numb or lock up (Tr. at 55). Plaintiff gets dizzy and lightheaded when he is taking a shower (Tr. at 55). He can cook sometimes, he can do dishes sometimes, he very rarely vacuums or mops (Tr. at 55). He can take out the trash if it is under ten pounds (Tr. at 56). He cannot do laundry, home repairs, or yard work (Tr. at 56). He is able to pay the bills and go grocery shopping once or twice a week for under 30 minutes (Tr. at 56). Plaintiff does not go to church or to the movies, he does not fish, he does no volunteer work, he does not go for walks, and he uses the computer very little (Tr. at 57). He does not visit with family or friends, but he goes out to eat occasionally (Tr. at 57). Plaintiff reads a little and he plays a few games (Tr. at 57). He takes care of two cats and he attends his child's school activities on rare occasions (Tr. at 58).

Plaintiff helps his daughter with her bathroom needs, he helps her pick up things (Tr. at 58). He loses his concentration when he is helping her do puzzles or he falls asleep while he's lying on the couch watching something with his daughter (Tr. at 58). He loses interest and loses concentration (Tr. at 58).

## 2.  Vocational expert testimony.

Vocational expert Gary Weimholt testified at the request of the Administrative Law Judge. The first hypothetical involved a person with plaintiff's past work and who is limited to light work except that he would need to alternate between sitting, standing and walking every 45 minutes (Tr. at 75). The person could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl (Tr. at 75). He could never climb ladders, ropes or scaffolds (Tr. at 75). The person could do no overhead reaching with the right arm and no more than frequent use of his hands for handling, fingering and grasping (Tr. at 75). He would need to avoid concentrated exposure to temperature extremes, vibration, and work hazards (Tr. at 75). The vocational expert testified that such a person could perform all of plaintiff's past relevant work, i.e., dealer compliance representative or field representative of business services (Tr. at 76).

The second hypothetical was the same as the first except the person could have no awkward or prolonged positions of the head, and he could have no work tasks that require a production rate pace (Tr. at 76). The vocational expert testified that such a person could still perform plaintiff's past relevant work (Tr. at 76).

The third hypothetical was the same as the second except the person would need to have access to the restroom every hour for about five minutes (Tr. at 76). The vocational expert testified that in large commercial work environments, including automotive dealerships

or other industries such as financial services, and including the travel aspect, there would be access to a restroom on an hourly basis (Tr. at 76).

This hypothetical person would also be able to perform the following sedentary jobs: credit reporting clerk, DOT 203.362-014, with an SVP of 4; automobile locator, DOT 296.368-010, with an SVP of 3; and information clerk, DOT 237.368-022, with an SVP of 4 (Tr. at 79-80).

These jobs do not permit the person to take half-hour breaks to lie down (Tr. at 77-78).

If a person has to use the restroom with such urgency or abruptness that the person would not be able to finish a sales call or finish making a sales presentation, this could cause some inefficiency (Tr. at 84). If this were a condition day in and day out, some accommodation of the work task would need to be made (Tr. at 84).

## V.     FINDINGS OF THE ALJ

Administrative Law Judge Cynthia Hale entered her opinion on February 20, 2013 (Tr. at 8-22). Plaintiff's last insured date was June 30, 2014 (Tr. at 8).

Step one. Plaintiff has not engaged in substantial gainful activity since his amended alleged onset date (Tr. at 10).

Step two. Plaintiff suffers from the following severe impairments: coronary artery disease requiring single-vessel coronary artery bypass grafting in 1993 and cardiac catheterization revealing stenosis in July 2011; diabetes mellitus; degenerative disc disease of the lumbar and cervical spines; fibromyalgia; obesity; and bladder dysfunction (Tr. at 10). Plaintiff's hypertension, gastroesophageal reflux disease, obstructive sleep apnea, and depression are medically determinable impairments but do not cause more than minimal limitations in his ability to perform basic work activities and are therefore not severe (Tr. at 10).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 12-13).

Step four.  Plaintiff retains the residual functional capacity to perform light work except that he would need to alternate between sitting, standing, and walking every 45 minutes; can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; can never climb ladders, ropes or scaffolds, or reach overhead on the right; can frequently use his hands for handling, fingering and grasping; must avoid concentrated exposure to temperature extremes, vibrations, and work hazards such as moving machinery and unprotected heights. He cannot be in awkward or prolonged positions of the head and should not do work tasks that require a production rate pace.  He needs to have access to and be allowed to use the restroom every hour for up to five minutes (Tr. at 14).  With this residual functional capacity, plaintiff can return to his past relevant work as a dealer compliance representative or field representative of business services (Tr. at 20).

Step five.  Alternatively, plaintiff has transferrable skills which would permit him to perform other jobs, such as credit clerk, automobile locator, information clerk, and billing clerk (Tr. at 22).

## VI.    OPINION OF KIMETHA FAIRCHILD, M.D.

Plaintiff's sole argument is that the ALJ erred in discrediting the opinion of Dr. Fairchild as reflected in the residual functional capacity assessment completed on January 7, 2013.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider

several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

The ALJ had this to say about Dr. Fairchild's opinion:

Dr. Fairchild also provided a Residual Functional Capacity Form on behalf of the claimant, dated the day before the claimant's hearing. She indicated that the claimant would be expected to miss work two or more days a month for treatment of and due to his impairments and would need to take extra breaks due to urinary frequency, would have problems using his hands for 1/3 of the work day, and would need to lie down during the day due to pain and fatigue. The undersigned has considered this opinion, but has given it only partial weight in that the claimant's residual functional capacity has been limited due to the claimant's diagnoses to less than light exertional work, with [additional restrictions]. However, the undersigned has not limited the claimant in accordance with the other limitations suggested by the claimant's physician, because the doctor's treatment notes and the rest of the medical evidence do not support such limitations. For example, the doctor limits the claimant due to neck related neuropathy, but the objective medical evidence does not support upper extremity neuropathy. Rather, during physical examination, the claimant is usually found to have intact sensation, strength, and reflexes with regard to his upper extremities.

(Tr. at 19-20).

Dr. Fairchild reported that plaintiff would need to take extra breaks to use the bathroom because of frequent urination and chronic neck and back pain "necessitating getting increased rest frequently throughout the day."

In September 2008 plaintiff reported that "for his entire life he has always urinated frequently." In October 2008 he reported urinated every one to two hours. Despite this he earned well over the substantial gainful activity amount during that year and this was almost three years before his amended alleged onset date. In November 2008, plaintiff's urinary

problems were noted to be managed by Uroxatral and the urologist's records indicate that plaintiff was "mostly satisfied with his urinary tract at present."

In June 2009, plaintiff denied frequent urination. In August 2009 his urinalysis was "totally negative" at Urology Associates. In September 2010, plaintiff denied frequent urination. In November 2011, plaintiff denied frequent urination. In March 2012, he went to the Urology Clinic at University of Missouri Health System for the first time and reported a significant history of incomplete emptying, even though every post void residual test he had had in the past had been normal. His post void residual on this day was normal as well. The urologist, Dr. Pokala, recommended that plaintiff cut down on his fluid intake after 7 p.m. to help with the nighttime urination.

In April 2012, plaintiff's CT urogram, which evaluates the kidneys, ureters and bladder, was normal. His cystoscopy, which allows the doctor to look inside the bladder, was normal. In November 2012, the urologist found that everything was normal and that plaintiff was "entirely asymptomatic."

Plaintiff's urologists did not need to see him any more frequently than once every six months, and his testing at both urology clinics was normal at each visit.

Despite all of this evidence, the ALJ did indeed limit plaintiff to work that would permit him to have access to and be allowed to use the restroom every hour for up to five minutes, which is not inconsistent with Dr. Fairchild's recommendations.

Dr. Fairchild reported that plaintiff would have problems using his hands "on a regular basis for 1/3 of the workday" due to neck related neuropathy. The first time neuropathy is mentioned in the medical records was during a November 5, 2012, visit to orthopedic surgeon Joel Jeffries, M.D., for evaluation of back and leg pain. Plaintiff reported dysesthesias (abnormal sensation) in his hands "and has by report been told that these represented

42

peripheral neuropathy likely secondary to his diabetes." Plaintiff reported difficulty with fine motor control. However, his active range of motion in his neck was only mildly diminished and he had only mild tenderness without muscle spasm. Motor strength testing of his arms was normal. X-rays of his neck showed only mild degenerative change. He was assessed with mild cervical spondylosis and no functional limitations were recommended. None of plaintiff's diabetes-related medical records suggest that diabetic neuropathy was ever suspected.

Contrary to plaintiff's argument, no doctor ever found that plaintiff suffers from neuropathy. Plaintiff argues in his brief that "the record is replete with mentions of neck pain caused by neuropathy." However, the notations of neck pain due to neuropathy consisted only of plaintiff's allegation to Dr. Jeffries on one occasion and Dr. Fairchild's reliance on neuropathy in her residual functional capacity assessment, not even in her own treatment records. Complaints of neck pain and even objective findings of mildly reduced cervical range of motion or mild degenerative changes in the cervical spine (which are indeed in this record) do not equal a finding of neuropathy. The ALJ correctly points out that sensation testing was consistently normal. Dr. Fairchild herself, on July 31, 2012, noted that plaintiff's grip strength was normal. There simply is no evidence that plaintiff would have problems using his hands "on a regular basis for 1/3 of the workday due to neck related neuropathy."

Dr. Fairchild found that plaintiff would need to lie down during the day due to fatigue because he often does not sleep well because of his chronic pain and because of cervical and lumbar spondylosis and fibromyalgia.

Plaintiff was prescribed Ambien for insomnia prior to his alleged onset date. In September 2010, he said that it was working well for his insomnia and he denied fatigue. On November 18 2011, he denied fatigue. On January 27, 2012, Dr. Fairchild's own treatment records indicate that plaintiff denied insomnia, and he denied fatigue. On August 28, 2012,

Dr. Fairchild's treatment notes indicate that plaintiff denied fatigue. On October 30, 2012, Dr. Fairchild's treatment records indicate that plaintiff denied insomnia.

Plaintiff's chronic pain, lumbar spondylosis and fibromyalgia do not provide a basis for the need to lie down during the day. Plaintiff was advised by Dr. McQuie, Dr. David, Physician's Assistant Baugher, Dr. Kuhns, and even Dr. Fairchild herself to exercise. In fact, just a few months before the residual functional capacity assessment was completed by Dr. Fairchild, she wrote in her treatment notes that plaintiff said he felt better when he exercised.

Additionally, the record establishes that lying down actually aggravates plaintiff's symptoms, it is not a relieving factor. He told Ms. Baugher that lying down makes his symptoms worse. He told Dr. Varghese that his symptoms are aggravated by lying down. He testified during the administrative hearing that lying down aggravates his symptoms (Tr. at 44). And Dr. Fairchild even noted in her treatment records dated May 1, 2012, and July 31, 2012, that his symptoms are aggravated by lying down.

Dr. Fairchild's treatment records do not support the limitations found in her residual functional capacity assessment. She treated plaintiff for one year prior to assessing these limitations. On January 12, 2012, her exam was thorough and entirely normal. On May 1, 2012, she found that plaintiff's back was stable, his symptoms were aggravated by lying down and resting, he was walking around the block twice a day for exercise, and his blurred vision and shakiness were caused by failing to adhere to a diabetic diet and those symptoms resolved within minutes of his eating. On July 31, 2012, she noted that plaintiff was noncompliant with diet, his diabetes and hypertension were stable, his worsening back pain was aggravated by lying down or resting, his grip strength was good, and his cervical x-rays showed only mild degenerative changes. On August 28, 2012, she found that his compliance with exercise was poor and he had only mildly reduced range of motion in his cervical and lumbar spine, and

44

she recommended that he walk for exercise. On September 27, 2012, she told him to exercise and improve his diet. On October 30, 2012, she noted that plaintiff feels better when he exercises, his hypertension was stable, his back pain was stable, his back and leg pain were relieved by walking, his gait was normal, his diabetes was controlled, and he had only 8 of 18 fibromyalgia tender points. On December 12, 2012, she found that plaintiff's myofascial pain syndrome was controlled, his diabetes was stable, and his hypertension was stable.

Finally, I note that plaintiff has a history of requesting medical forms for disability services from treatment providers who have not made the findings in their treatment notes that they make on those disability forms. For example, he asked a nurse practitioner at Urology Associates to sign off on a form for a disabled placard based on his statement that he had difficulty walking due to bypass surgery. Two months later, he was found by a cardiologist to have only mild coronary artery disease with no associated symptoms, and he was found to have no symptoms associated with hypertension or diabetes and normal range of motion. Plaintiff's request of a urology nurse to make a finding that he cannot walk due to cardiac symptoms when he was being treated by a cardiologist certainly does not bode well for his credibility.

Next plaintiff asked Dr. Fairchild to sign a form so he could renew his handicap placard. She complied, stating on the form that plaintiff needed the handicap placard because he was unable to walk more than 50 feet due to arthritis. Yet on that same day, she noted in her treatment records that he had been noncompliant with exercise and recommended that he walk for exercise. Additionally, that very day plaintiff had been seen in the orthopedic clinic but did not get the form for the handicap placard signed by the doctor actually treating him for the condition which he alleged caused him to need the placard.

Later plaintiff saw an orthopedic specialist, Dr. Kuhns, about disability, indicating that he cannot walk much. Dr. Kuhns found no orthopedic reason for these alleged limitations. He

45

told plaintiff he was not disabled, that he needed to exercise, lose weight, and manage his diabetes better. Later that day plaintiff told Dr. Fairchild that Dr. Kuhns had been rude to him, and plaintiff asked her to write him a letter saying that he was unable to work so that he could get food stamps. Although Dr. Fairchild saw plaintiff that day for a rash and found that (1) he denied blurred vision, (2) his blood pressure was normal, (3) his gait was normal, (4) he had good mood and affect, (5) his back pain was being followed by another doctor, (6) his depression not otherwise specified was improved, and (7) his diabetes was controlled, and her recommendations were that he improve his diet and exercise, she did indeed write a letter for him indicating that he was disabled so that he could get food stamps.

Clearly Dr. Fairchild's residual functional capacity assessment, which is not supported by her treatment records, is another favor she performed for a patient in order to help him secure benefits as she had done several times already in the past.

## VII.    CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge


Kansas City, Missouri
March 23, 2015

46